**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

CASE NO. _____

MARGARET BOPP, and MARY BOPP
d/b/a ROSEMONT, LLC

           Plaintiff,

v.

OAKLAND VENTURES, LLC,
DARRAGH KENNY, COURTNEY
DE HECHAVARRIA, ALL SEASONS
EQUINE VETERINARY PRACTICE LLC,
And EMILY DEAN,

           Defendants.

_____

## COMPLAINT

    Plaintiff, Margaret Bopp ("Margaret"), and Plaintiff, Mary Bopp d/b/a Rosemont LLC

("Mary" and together with Margaret, "Plaintiffs"), sue Defendant, Oakland Ventures, LLC

("Oakland"), Defendant, Darragh Kenny ("Kenny"), Defendant, Courtney De Hechavarria ("De

Hechavarria" and together with Oakland and Kenny, the "Oakland Defendants"), Defendant, All

Seasons Equine Veterinary Practice LLC ("All Seasons"), and Defendant,  Emily Dean ("Dean"

and together with All Seasons, the "Dean Defendants," and collectively with the Oakland

Defendants, "Defendants"), and allege as follows:

## PARTIES

    1.      Margaret is a natural person, and is a citizen, and resident, of the State of

Connecticut.

    2.      Mary is a natural person, and is a citizen, and resident, of the State of Connecticut.



3.      Oakland is a Florida Limited Liability Company, with its principal place of business located at 12160 Sunnydale Drive, Wellington, FL.

4.      Kenny is a natural person, who, upon information and belief, is a citizen of Ireland, and is a resident of the State of Florida.

5.      De Hechavarria is a natural person, and is a resident, and citizen, of the State of Florida.

6.      At all relevant times herein, Kenny, and De Hechavarria, were the only members of Oakland.

7.      All Seasons is a Florida Limited Liability Company.

8.      Dean is a natural person, and is a citizen, and resident, of the State of Florida.

9.      At all relevant times herein, Dean was the only member of All Seasons.

## CHOICE OF LAW

10.     Connecticut law applies to Plaintiffs' claims, because Connecticut has the most significant relationship to the occurrence.  The subject sale of the horse at issue in this litigation was effectuated in Connecticut, where the horse was stabled.  The majority, if not all, of the misrepresentations, and fraudulent conduct, attributable to the Oakland Defendants, occurred in Connecticut.  Moreover, the pre-purchase veterinary examination which forms the basis of Margaret's claims against the Dean Defendants occurred in Connecticut.

11.     Connecticut is the place where the conduct causing Plaintiffs' injuries occurred.

12.     Connecticut also has a substantial interest in preventing the unfair and deceptive trade practices with respect to the sale of the subject horse.



## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this matter, pursuant to 28 U.S.C. §1332(1), because the matter in controversy exceeds the sum or value of Seventy Five Thousand Dollars ($75,000.00), exclusive of interests and costs, and because there is diversity, as Plaintiffs, and Defendants, are citizens of different states.

14.     Venue in this Court is appropriate, pursuant to 28 U.S.C. §1391(b)(1), because Defendants are all residents of the State of Florida, and at least one (1) Defendant resides in this District.

## FACTS COMMON TO ALL COUNTS

15.     According to its website (the "Oakland Website"), Oakland was founded in 2012, by Kenny.

16.     The Oakland Website states that "[o]ver the last three years, [Oakland] has thrived as one of the most successful competition barns across the United States, with Kenny at the helm."

17.     Oakland also sells horses that compete in equestrian competitions, including horses that compete in competitive jumping events.

18.     In 2013, Margaret decided to purchase a horse that was suitable to be ridden in competitive jumping competitions.

19.     Margaret's intended use for the horse was to successfully compete in competitive jumping events, increasing the value of the horse.

20.     Margaret's trainer knew Kenny, and approached Margaret about potentially purchasing Cequila, a horse that was then owned by Oakland.

21.     Margaret agreed to meet Kenny, and try Cequila.



22.     In or about September, 2013, Margaret met Kenny at Ox Ridge Stables, in Darien, Connecticut, where Cequila was stabled.

23.     Margaret advised Kenny that she was seeking to purchase a horse to successfully compete in jumping events, thereby increasing its value.

24.     Kenny extolled the virtues of Cequila as a competitive jumper.

25.     Kenny told Margaret that Cequila was fit for Margaret's intended purpose of competitive jumping, and that Cequila's value would increase as she continued to compete successfully.

26.     In fact, Kenny told Margaret that his mother owned Cequila before Kenny did, and that he was intimately familiar with Cequila's health, and performance capabilities.

27.     Indeed, Kenny told Margaret that Cequila was extremely successful in competitive jumping events throughout Europe.

28.     When Margaret asked Kenny about Cequila's health, Kenny advised Margaret that she was in good health, and never had any medical issues.

29.     Margaret noticed thrombosis on the left side of Cequila's neck, and asked Kenny what it was from.

30.     Kenny advised Margaret that Cequila always had thrombosis, and that it was never an issue.

31.     Margaret asked Kenny if surgery was ever performed on Cequila.

32.     Kenny responded unequivocally that surgery was never performed on Cequila.



33.     Margaret would later learn that Kenny's statement that surgery had never been performed on Cequila was false, and that the thrombosis was the direct result of an IV being placed in Cequila during the performance of surgery for colic.

34.     Margaret tried Cequila a second time in Bedford Hill, New York.

35.     During this second trial, Kenny again praised Cequila's prowess as a competitive jumper, and represented that she was healthy, and fit for Margaret's intended purpose.

36.     Based upon Kenny's representations as to the health, soundness, and fitness for Margaret's intended use and purpose, Margaret agreed to purchase Cequila for Four Hundred Thousand Dollars ($400,000.00), subject to the performance of a pre-purchase examination (the "Pre-Purchase Examination") by a veterinarian.

37.     Margaret contacted Dean, the principal of All Seasons, to discuss the potential retention of the Dean Defendants to perform the Pre-Purchase Examination.

38.     Margaret advised Dean that she was purchasing Cequila to perform successfully in competitive jumping events, thereby increasing her value.

39.     Margaret further advised Dean that the purpose of the Pre-Purchase Examination was to determine Cequila's health, soundness, and fitness as a competitive jumper.

40.     Dean represented to Margaret that the Dean Defendants had vast experience in performing pre-purchase examinations to determine whether a horse was suitable to be purchased as a competitive jumper, and were qualified to perform the Pre-Purchase Examination on Cequila.

41.     Based on the Dean Defendants' representations as to their qualifications to perform the Pre-Purchase Examination on Cequila, Margaret entered into a verbal agreement (the "Pre-Purchase Examination Agreement"), pursuant to which the Dean Defendants would perform the



Pre-Purchase Examination on Cequila to determine her health, soundness, and fitness as a competitive jumper.

42.     Pursuant to the Pre-Purchase Examination Agreement, the Dean Defendants agreed to use customary professional veterinary standards when determining Cequila's health, soundness, and fitness for intended use as a competitive jumper in performing the Pre-Purchase Examination.

43.     Pursuant to the Pre-Purchase Agreement, the Dean Defendants also agreed to prepare, and deliver to Margaret, a pre-purchase report (the "Pre-Purchase Report") setting forth the findings of the Pre-Purchase Examination.

44.     On or about October 3, 2013, the Dean Defendants performed the Pre-Purchase Examination of Cequila at the Ox Ridge Stables.

45.     However, the Dean Defendants did not deliver the Pre-Purchase Report to Margaret, as they were required to.

46.     Instead, Dean verbally advised Margaret that Cequila was healthy, sound, and fit for Margaret's intended use as a competitive jumper.

47.     As a result of the Dean Defendants', and the Oakland Defendants', representations that Cequila was sound, and fit for her intended use as a competitive jumper, Margaret decided to purchase Cequila for Four Hundred Thousand Dollars ($400,000.00).

48.     On or about October 10, 2013, Margaret, and Oakland, entered into that certain Sales Agreement (the "Purchase Agreement"), pursuant to which Oakland agreed to sell to Margaret, and Margaret agreed to purchase from Oakland, Cequila, for the total price of Four Hundred Thousand Dollars ($400,000.00) (the "Purchase Price").   A copy of the Purchase Agreement is attached hereto at Exhibit "A."



49.    The Purchase Price consisted of Three Hundred Thousand Dollars ($300,000.00) in cash, and One Hundred Thousand Dollars ($100,000.00) in additional consideration which consisted of the transfer of an Eighty Five Percent (85%) ownership interest in a horse owned by Mary, who is Margaret's mother, named Shining De Reve, to Kenny and Oakland.

50.    The transfer of this additional consideration is memorialized in that certain Bill of Sale (the "Bill of Sale"), dated October 10, 2013, between Rosemont, as Seller, and Kenny and Oakland, as Buyers.  A copy of the Bill of Sale is attached hereto at Exhibit "B."

51.    Pursuant to the Bill of Sale, Kenny, and Oakland, were responsible for paying all costs and expenses for Shining De Reve.

52.    Pursuant to the Bill of Sale, if Shining De Reve was sold for in excess of One Hundred Fifty Thousand Dollars ($150,000.00), Kenny, and Oakland, would by obligated to pay to Mary an additional Fifteen Percent (15%) of any monies paid over the amount of One Hundred Fifty Thousand Dollars ($150,000.00) for Shining De Reve (the "Additional Payment").

53.    The Additional Payment is separate and apart from, and in addition to, the Fifteen Percent (15%) of any price paid for Shining De Reve that Mary is entitled to by virtue of her Fifteen Percent (15%) ownership interest in Shining De Reve.

54.    In or about August, 2014, Margaret was bathing Cequila, when she discovered a large scar running vertically down Cequila's abdomen.

55.    This was the first time that Margaret ever saw the scar.

56.    The scar on Cequila's abdomen was not the result of any incident that occurred while Margaret owned Cequila.



57.     What made Margaret's discovery of the scar particularly appalling was the fact that the Oakland Defendants represented to Margaret that Cequila did not have any health issues, and that Cequila never had surgery performed on her.

58.     Margaret now realized that the Oakland Defendants made material misrepresentations to her regarding Cequila.

59.     Margaret contacted Dean, who inspected Cequila in Bedford Hills, New York in or about September, 2014.

60.     Margaret confronted Dean about the scar on Cequila's abdomen, and asked Dean how she "could have missed it."

61.     Dean admitted to Margaret that she "missed the scar," and apologized profusely for not disclosing it to Margaret.

62.     At this point, Margaret demanded a copy of the Pre-Purchase Report from Dean, which the Dean Defendants finally provided.  A copy of the Pre-Purchase Report is attached hereto at Exhibit "C."

63.     The Pre-Purchase Report reflects that Cequila was being evaluated by the Dean Defendants with her intended use as a "Jumper."

64.     The Pre-Purchase Report reflects that there was no disclosed medical history, and no disclosed surgical history, as Margaret relied upon the Oakland Defendants' representations that Cequila had no medical issues, and was never operated on.

65.     In the Pre-Purchase Report, the Dean Defendants represented that Cequila had "[g]ood general body condition, good hair coat, well developed musculature [and that her c]onformation [was] Unremarkable."



66.    Significantly, on page two (2) of the Pre-Purchase Report, the Dean Defendants represented that there was "**no abdominal scar noted**." (emphasis added).

67.    The Pre-Purchase Report did not disclose any [major] health, soundness, or fitness issues that would preclude Cequila from competing successfully in competitive jumping events.

68.    Concerned as to Cequila's health, Margaret took Cequila to Dr. Robert Boswell, a veterinarian located in Wellington, Florida, to examine her.

69.    Dr. Boswell examined Cequila, and determined that the scar on her abdomen was the result of a major surgery, which was likely a celiotomy performed to treat colic.

70.    Dr. Boswell determined that the surgery was performed prior to Margaret's purchase of Cequila, and that the thrombosis, which Kenny stated was minor, and always presents, was substantial, and caused by an IV being placed in Cequila as a result of the colic surgery.

71.    Had the colic been disclosed to Margaret by the Oakland Defendants, Margaret would not have purchased Cequila, as colic destroys the inherent value of a horse.

72.    In addition to paying Four Hundred Thousand Dollars ($400,000.00) for a horse with colic, Margaret has incurred in excess of One Hundred Thousand Dollars ($100,000.00) in expenses, on, among other things, veterinary care, and diagnostic testing for Cequila.

73.    Moreover, Mary has learned that Shining De Reve was sold by Oakland, and Kenny, for an undisclosed price.

74.    Neither Kenny, nor Oakland, notified Mary of Shining De Reve's sale, despite their obligation to do so.



75.     Despite their obligation to remit payment to Mary on account of her fifteen percent (15%) ownership interest in Shining De Reve, Oakland, and Kenny, have refused to make any payments to Mary.

76.     The Oakland Defendants have engaged in an unlawful, deceptive scheme to conceal the true nature of Cequila's health from Plaintiffs.

77.     In furtherance of this scheme, the Oakland Defendants exhibited willful, and malicious conduct to defraud Plaintiffs.

78.     All conditions precedent to the filing of this lawsuit have occurred, or been waived.

## COUNT I

**(Fraudulent Inducement – On Behalf of Margaret, As Against the Oakland Defendants)**

79.     Plaintiffs repeat and reallege each of the foregoing allegations in paragraphs 1 - 78 as if more full set forth at length herein.

80.     The Oakland Defendants made multiple misrepresentations, and omissions, of material fact as to the soundness, health, and suitability of Cequila for purchase and use by Margaret.

81.     Among other things, the Oakland Defendants represented to Margaret that Cequila had no health issues, and was sound and fit for her intended use as a competitive jumper.

82.     The Oakland Defendants also represented to Margaret that Cequila never had surgery performed on her.

83.     At the time the Oakland Defendants made the misrepresentations, and omissions, of material fact, the Oakland Defendants knew that they were false, and the Oakland Defendants intended that Margaret would rely on them in.



84.     Margaret relied on the Oakland Defendants' misrepresentations, and omissions, of material fact.

85.     As a result of the Oakland Defendants' misrepresentations, and omissions, of materials fact, Margaret has suffered, and continues to suffer, substantial damages.

WHEREFORE, Margaret demands judgment against the Oakland Defendants for damages, including punitive damages, and attorneys' fees and costs, in an amount to be determined, and for such other, further, and different relief as the Court deems just, equitable and proper.

## COUNT II

**(Negligent Misrepresentation – On Behalf of Margaret, As Against the Oakland Defendants)**

86.     Margaret repeats and realleges each of the foregoing allegations in paragraphs 1 – 78 as if more full set forth at length herein.

87.     The Oakland Defendants made multiple misrepresentations, and omissions, of material fact as to the soundness, health, and suitability of Cequila for purchase and use by Margaret.

88.     Among other things, the Oakland Defendants represented to Margaret that Cequila had no health issues, and was sound and fit for her intended use as a competitive jumper.

89.     The Oakland Defendants also represented to Margaret that Cequila never had surgery performed on her.

90.     At the time the Oakland Defendants made the misrepresentations, and omissions, of material fact, the Oakland Defendants knew, or should have known, that they were false.

91.     Margaret justifiably relied on the Oakland Defendants' misrepresentations, and omissions, of material fact, and was damaged as a result of such justifiable reliance.



92.     As a result of the Oakland Defendants' negligent misrepresentations, Margaret has suffered, and continues to suffer, substantial damages.

WHEREFORE, Margaret demands judgment against the Oakland Defendants for damages, in an amount to be determined, including attorneys' fees and costs, and for such other, further, and different relief as the Court deems just, equitable and proper.

## COUNT III

**(Negligent Misrepresentation – On Behalf of Margaret, As Against the Dean Defendants)**

93.     Margaret repeats and realleges each of the foregoing allegations in paragraphs 1 – 78 as if more full set forth at length herein.

94.     The Dean Defendants made multiple misrepresentations, and omissions, of material fact as to the soundness, health, and suitability of Cequila for purchase and use by Margaret.

95.     Among other things, the Dean Defendants represented to Margaret that Cequila had no health issues, and was sound and fit her intended use as a competitive jumper.

96.     Indeed, Dean apologized to Margaret, and admitted she had no explanation for the Dean Defendants "missing" the large scar on Cequila's abdomen.

97.     At the time the Dean Defendants made the misrepresentations, and omissions, of material fact, the Dean Defendants knew, or should have known, that they were false.

98.     Margaret justifiably relied on the Dean Defendants' misrepresentations, and omissions, of material fact, and was damaged as a result of such justifiable reliance.

99.     As a result of the Dean Defendants' negligent misrepresentations, Margaret has suffered and continues to suffer, substantial damages.



WHEREFORE, Margaret demands judgment against the Dean Defendants for damages, in an amount to be determined, including attorneys' fees and costs, and for such other, further, and different relief as the Court deems just, equitable and proper.

## <u>COUNT IV</u>

### (Violations of C.G.S. §42-110b – Connecticut Unfair Trade Practices Act ("CUTPA") – As and On behalf of Margaret, as Against the Oakland Defendants)

100.    Margaret repeats and realleges each of the foregoing allegations in paragraphs 1 – 78 as if more full set forth at length herein.

101.    The Oakland Defendants have engaged in unfair, deceptive, and unconscionable acts and practices in violation of CUTPA.

102.    The Oakland Defendants, acting as business persons, made misrepresentations, and omissions, of material facts while active participants in trade or commerce with Margaret.

103.    The Oakland Defendants made multiple misrepresentations, and omissions, of material fact as to the soundness, health, and suitability of Cequila for purchase and use by Margaret.

104.    Among other things, the Oakland Defendants represented to Margaret that Cequila had no health issues, and was sound and fit for her intended use as a competitive jumper.

105.    The Oakland Defendants also represented to Margaret that Cequila never had surgery performed on her.

106.    Margaret has been injured by virtue of the Oakland Defendants' deceptive and unfair trade practices as contemplated by CUTPA.



107.     As a result of the Oakland Defendants' violations of CUTPA, Margaret has suffered, and continues to suffer, damages.

WHEREFORE, Margaret demands judgment against the Oakland Defendants, for damages, including punitive damages and attorneys' fees and costs, in an amount to be determined, and for such other, further, and different relief as the Court deems just, equitable and proper.

### Count V

### (Breach of Contact – Purchase and Sale Agreement - On Behalf of Margaret, Against Oakland)

108.     Margaret repeats and realleges each of the foregoing allegations in paragraphs 1 – 78 as if more full set forth at length herein

109.     Margaret, and the Oakland Defendants, entered into a valid binding contract (*to wit,* the Purchase Agreement).

110.     The Oakland Defendants materially breached the Purchase Agreement by, among other things, not delivering a horse of the health, soundness, conformity, and fitness for intended purpose that they represented to Margaret.

111.     The Oakland Defendants further breached the Purchase Agreement by breaking the covenant of good faith and fair dealing in every contract that implies that no party will do anything that will have the effect of destroying or injuring the right of any other party to receive the fruits of the contract.

112.     As a result of the Oakland Defendants' breach of the Purchase Agreement, Margaret has suffered, and continues to suffer, substantial damages.



WHEREFORE, Margaret demands judgment against the Oakland Defendants for damages, in an amount to be determined, including attorneys' fees and costs, and for such other, further, and different relief as the Court deems just, equitable and proper.

## Count VI

**(Breach of Contact – Bill of Sale - On Behalf of Mary, As Against Kenny, and Oakland)**

113.    Mary repeats and realleges each of the foregoing allegations in paragraphs 1 – 78 as if more full set forth at length herein.

114.    Mary, Kenny, and Oakland entered into a valid binding contract (*to wit*, the Bill of Sale).

115.    Kenny, and Oakland, materially breached the Bill of Sale, by selling Shining De Reve, and not remitting the required amounts resulting from said sale to Mary, as set forth therein.

116.    Kenny, and Oakland, further breached the Bill of Sale by breaking the covenant of good faith and fair dealing in every contract that implies that no party will do anything that will have the effect of destroying or injuring the right of any other party to receive the fruits of the contract.

117.    As a result of Kenny's, and Oakland's, breach of the Bill of Sale, Mary has suffered, and continues to suffer, substantial damages.

WHEREFORE, Mary demands judgment against the Kenny, and Oakland, for damages, in an amount to be determined, including attorneys' fees and costs, and for such other, further, and different relief as the Court deems just, equitable and proper.



## COUNT VII

**(Breach of Oral Contact – Pre-Purchase Examination Agreement - On Behalf of Margaret, Against the Dean Defendants)**

118.     Margaret repeats and realleges each of the foregoing allegations in paragraphs 1 – 78 as if more full set forth at length herein

119.     Margaret, and the Dean Defendants, entered into a valid binding contract (*to wit,* the Pre-Purchase Examination Agreement).

120.     The Dean Defendants materially breached the Pre-Purchase Examination Agreement by, among other things, failing to competently perform the veterinary services that Margaret retained them to perform, and failing to timely deliver the Pre-Purchase Report.

121.     As a result of the Dean Defendants' breach of the Pre-Purchase Examination Agreement, Margaret has suffered, and continues to suffer, substantial damages.

WHEREFORE, Margaret demands judgment against the Dean Defendants for damages, in an amount to be determined, including attorneys' fees and costs, and for such other, further, and different relief as the Court deems just, equitable and proper.

## COUNT VIII

**(Civil Conspiracy – On Behalf of Margaret, As Against the Oakland Defendants)**

122.     Margaret repeats and realleges each of the foregoing allegations in paragraphs 1 – 78 as if more full set forth at length herein.

123.     The Oakland Defendants engaged in an unlawful, fraudulent scheme to conceal the true nature of Cequila's health, and the suitability for her intended purpose.

124.     The Oakland Defendants committed multiple acts in furtherance of their conspiracy, including, but not limited to, making multiple misrepresentations, and omissions of fact, regarding



the true nature of Cequila's health, and the true nature of Cequila's suitability for her intended purpose.

125.    As a result of the Oakland Defendants' conspiracy, and acts taken in furtherance thereof, Margaret has suffered, and continues to suffer, substantial damages.

WHEREFORE, Margaret demands judgment against the Oakland Defendants for damages, including punitive damages and attorneys' fees and costs, in an amount to be determined, and for such other, further, and different relief as the Court deems just, equitable and proper.

## COUNT IX

### (Civil Conspiracy – On Behalf of Mary, As Against the Kenny, and Oakland)

126.    Mary repeats and realleges each of the foregoing allegations in paragraphs 1 – 78 as if more full set forth at length herein.

127.    Kenny, and Oakland, engaged in an unlawful, fraudulent scheme to conceal the sale of Shining De Reve from Mary, in order to avoid having to pay her the amounts they were obligated to.

128.    Kenny, and Oakland, committed multiple acts in furtherance of their conspiracy, including intentionally refusing to notify Mary of the sale.

129.    As a result of Kenny's, and Oakland's, conspiracy, and acts taken in furtherance thereof, Mary has suffered, and continues to suffer, substantial damages.

WHEREFORE, Mary demands judgment against Kenny, and Oakland, for damages, including punitive damages, and attorneys' fees and costs, in an amount to be determined, and for such other, further, and different relief as the Court deems just, equitable and proper.



## COUNT X

### (Conversion – On Behalf of Mary, As Kenny, and Oakland)

130.    Mary repeats and realleges each of the foregoing allegations in paragraphs 1 – 78 as if more full set forth at length herein.

131.    Mary had a fifteen percent (15%) ownership interest in Shining De Reve.

132.    Consequently, fifteen percent (15%) of all proceeds from the sale of Shining De Reve, in addition to the Additional Payment, if any, are the property of Mary.

133.    Oakland, and Kenny, sold Shining De Reve, and assumed and exercised ownership of all funds relating to said sale, without Mary's authorization.

134.    As a result of Kenny's, and Oakland's, conversion, Mary has suffered, and continues to suffer, substantial damages.

WHEREFORE, Mary demands judgment against Kenny, and Oakland, for damages, including punitive damages and attorneys' fees and costs, in an amount to be determined, and for such other, further, and different relief as the Court deems just, equitable and proper.

## COUNT XI

### (Theft – On Behalf of Mary, As Kenny, and Oakland)

135.    Mary repeats and realleges ach of the foregoing allegations in paragraphs 1 – 78 as if more full set forth at length herein.

136.    Mary had a fifteen percent (15%) ownership interest in Shining De Reve.

137.    Consequently, fifteen percent (15%) of all proceeds from the sale of Shining De Reve, in addition to the Additional Payment, if any, are the property of Mary.



138.     Oakland, and Kenny, sold Shining De Reve, and intentionally took possession of and exercised ownership of all funds relating to said sale, without Mary's authorization.

139.     As a result of Kenny's, and Oakland's, theft, Mary has suffered, and continues to suffer, substantial damages.

WHEREFORE, Mary demands judgment against Kenny, and Oakland, for damages, including punitive damages and attorneys' fees and costs, in an amount to be determined, and for such other, further, and different relief as the Court deems just, equitable and proper.

## COUNT XII

**(Medical Malpractice – On Behalf of Margaret, As Against the Dean Defendants)**

140.     Mary repeats and realleges each of the foregoing allegations in paragraphs 1 – 78 as if more full set forth at length herein.

141.     The Dean Defendants were retained by Margaret to perform a Pre-Purchase Examination, and prepare a Pre-Purchase report, in order to determine whether Cequila was healthy, sound, and fit to be utilized as a competitive jumper.

142.     The Dean Defendants had a duty to exercise that level of care, skill, and treatment which in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate for an equine veterinarian.

143.     The Dean Defendants breached the standard of care they owed to Margaret by misrepresenting Cequila's health, soundness, and suitability for the intended purpose.

144.     Among other things, the Dean Defendants failed to notify Margaret of a large surgical scar located on Cequila's abdomen.



145.     The Dean Defendants' breach of their duty of care to Margaret was the proximate cause of Margaret's damages.

146.     As a result of the Dean Defendants' malpractice, Margaret has suffered, and continued to suffer, substantial damages.

WHEREFORE, Margaret demands judgment against the Dean Defendants for damages, in an amount to be determined, including attorneys' fees and costs, and for such other, further, and different relief as the Court deems just, equitable and proper.

### COUNT XIII (IN THE ALTERNATIVFE)

**(Rescission – On behalf of  Plaintiffs, As Against the Oakland Defendants)**

147.     Plaintiffs repeat and reallege each of the foregoing allegations in paragraphs 1 – 78 as if more full set forth at length herein.

148.     Margaret, as buyer, and Oakland, as seller, entered into the Purchase Agreement, pursuant to which Margaret agreed to purchase Cequila.

149.     As part of the consideration for the purchase of Cequila, Rosemont agreed to sell to Kenny, and Oakland, an Eighty Five Percent (85%) ownership interest in Shining De Reve.

150.     Had the Oakland Defendants not fraudulently misrepresented, and intentionally concealed, Cequila's true health, Margaret would not have entered into the Purchase Agreement, and Mary would not have entered into the Bill of Sale.

151.     Plaintiffs have no adequate remedy at law.

WHEREFORE, Margaret demands rescission of the Purchase Agreement, and rescissory damages, and Mary demands rescission of the Bill of Sale, and rescissory damages, together with such other, further, and different relief as the Panel deems just, equitable and proper.



## COUNT XIV

**(Unjust Enrichment – On Behalf of Plaintiffs, As Against the Oakland Defendants)**

152.     Plaintiffs repeat and reallege each of the foregoing allegations in paragraphs 1 – 78 as if more full set forth at length herein.

153.     Margaret, as buyer, and Oakland, as seller, entered into the Purchase Agreement, pursuant to which Margaret agreed to purchase Cequila.

154.     As part of the consideration for the purchase of Cequila, Rosemont agreed to sell to Kenny, and Oakland, an Eighty Five Percent (85%) ownership interest in Shining De Reve.

155.     Had the Oakland Defendants not fraudulently misrepresented, and intentionally concealed, Cequila's true health, Margaret would not have entered into the Purchase Agreement, and Mary would not have entered into the Bill of Sale.

156.     Margaret paid consideration in the sum Four Hundred Thousand Dollars to Oakland ($400,000.00) for Cequila.

157.     Margaret remitted Three Hundred Thousand ($300,000.00) in cash, and the additional One Hundred Thousand Dollars ($100,000.00) in consideration was provided in the form of an Eighty Five Percent (85%) ownership interest in Shining De Reve.

158.     The Four Hundred Thousand Dollars ($400,000.00) in consideration represents a benefit conferred on the Oakland Defendants, which the Oakland Defendants accepted, and retained, to Plaintiffs' detriment.

159.     It would be inequitable for the Oakland Defendants to retain the benefits conferred on them by Plaintiffs.



WHEREFORE, Plaintiffs demand judgment against the Oakland Defendants for damages in an amount to be determined, including attorneys' fees and costs, and for such other, further, and different relief as the Court deems just, equitable and proper.

DATED: March 17, 2016      BY:    /s/ Richard S. Lubliner
                                   RICHARD S. LUBLINER, ESQ.
                                   FBN: 0047741

                                   Greenstein and Associates, LLP
                                   1655 Palm Beach Lakes Boulevard, Suite 800
                                   West Palm Beach, Florida 33414
                                   Telephone: (561) 227-9344
                                   Facsimile: (561) 909-2114
                                   Primary Email: rlubliner@greenstein-law.com
                                   Alternate Email: cperales@greenstein-law.com

